OPINION.
{¶ 1} The plaintiff-appellant, the Cincinnati School District, Board of Education, appeals from the order of the trial court dismissing its complaint seeking to halt administrative proceedings conducted by the defendant-appellee, the Ohio Department of Education, concerning a proposed transfer of certain properties out of the Cincinnati School District. The basis of the Board's complaint was that comity and considerations of judicial economy required that the state administrative proceedings be halted in deference to a subsequent federal action filed by the board to challenge the proposed transfer on equal-protection grounds.[1]
 {¶ 2} In its two assignments of error, the board asserts (1) that the trial court's failure to declare a stay of the state proceedings until the federal action had been resolved violated the policy of abstention adopted by the Ohio Supreme Court in State ex rel. Zellner v. Bd. ofEdn. of Cincinnati (1973), 34 Ohio St.2d 199, 297 N.E.2d 528; and (2) that the trial court's failure to rule on its material claim for declaratory relief constituted reversible error. For the following reasons, we conclude that neither assignment has merit.
 FACTS {¶ 3} On September 6, 2000, ODE acknowledged receipt of a petition submitted by Mr. R.J. Cummings of 5723 Windridge Drive in the city of Maderia, Ohio, proposing under R.C. 3311.254 to reposition the boundary between the Cincinnati School District and the Maderia City School District. The proposed repositioning would have transferred four homes located on Windridge Drive from the Cincinnati district to the Maderia district. Consistent with the administrative procedure for considering such requests, ODE requested the two school districts to submit data on issues surrounding the proposed transfer. The Maderia school district responded to the request for data within one month. The board, however, upon learning that Cummings had since moved from his Windridge address, unilaterally chose not to respond to the request.
 {¶ 4} In November of 2000, the board was informed by ODE that the current residents of Windridge Drive still favored the transfer and that the board was still required to respond to its earlier request for data in order that the administrative process might go forward. In testimony before the trial court, an attorney for the board made clear the board's opposition to the transfer based upon its view that such a transfer constituted an attempt at "racial gerrymandering" because the Cincinnati school system was predominately composed of black students and the Maderia school system was populated largely by white students. Although conceding that the proposed transfer involved no more than ten students from a system of more than 39,000, and that the board was not even sure of the race of the ten students who might be transferred out of the Cincinnati system, the board's attorney nonetheless cited the "domino theory" and "racial isolation" as reasons for the board's opposition to even the smallest of transfers. The board's attorney stated that the board did not believe that the state administrative process would afford it an adequate hearing on its equal-protection claims and therefore that the board had deliberately chosen not to participate in the process, and had instead filed a separate action in federal court on March 11, 2003. See Cincinnati School District v. State of Ohio, Bd. Of Edn., S.D.Ohio No. C2-04-CV-429. The board's federal action sought both declaratory and injunctive relief while asserting claims under the Equal Protection Clause and Section 1983, Title 42, U.S.Code.
 {¶ 5} Consistent with its view that the Ohio Supreme Court inZellner, supra, had announced a "red-line" rule that considerations of comity and judicial economy required the state to abstain from going forward with the administrative transfer process once its action was filed in federal court, the board filed the present complaint in the court below. The complaint alleged the pendency of the federal action and sought a declaratory judgment that the state action violated Ohio law and "must be barred until the federal lawsuit is resolved." Further, the complaint sought a preliminary injunction that would have prevented ODE from going forward with the scheduled administrative process.
 {¶ 6} A brief bench trial was conducted in which the parties each put on one witness to articulate their legal positions. The trial court found that ODE had "an obligation to proceed with the administrative process and that doing so will not cause irreparable harm" to the board. Further, the court found that neither Ohio law nor the evidence presented by the parties during trial justified the board's position that the state administrative process was required to be stayed pending the outcome of the federal action. The board's complaint was thus dismissed, and it is from this order that the board brings this appeal.
 ANALYSIS {¶ 7} In its first assignment of error, the board argues that because it was undisputed that it had filed a federal action challenging the proposed transfer on constitutional grounds, Ohio law, specifically the Ohio Supreme Court's decision in Zellner, supra, required that the state administrative transfer process be stayed until the federal action had been resolved. ODE, on the other hand, argues that Zellner, besides being factually distinguishable, must be viewed in a historical perspective, the product of a time, the early seventies, when federal courts were still deeply involved in school desegregation and when Ohio's administrative process, because of the rules in effect at the time, was ill-equipped to address the important issues of the day.
 {¶ 8} Since Zellner, ODE argues, two important changes have occurred in the law: First, the principle of federal abstention from interfering in state proceedings, known as Younger abstention, see Younger v. Harris
(1971), 404 U.S. 37, 91 S.Ct. 746, has been extended to pending state administrative proceedings provided that they are "judicial in nature."New Orleans Public Service Inc. v. City of New Orleans (1989), 491 U.S 350,370, 109 S.Ct. 2506; see, also, Middlesex County Ethics Committee. v.Garden State Bar Assn. (1982), 457 U.S. 423, 102 S.Ct. 2506; and OhioCivil Rights Comm. v. Dayton Christian Schools, Inc. (1986), 477 U.S. 619,106 S.Ct. 2718.[2]
 {¶ 9} Second, Zellner predates revisions to the Ohio Administrative Code, promulgated on February 1, 1987, that set forth the factors to be considered in transfer cases, and that now specifically include "racial isolation." See Ohio Adm.Code. Sections 3301-89-02(B)(2)(a) through (C) and 3901-89-03(B)(5). Because of these revisions, ODE argues, Zellner
concerned a different time "when no guarantee existed that racial isolation concerns would be considered" and was based upon policy considerations that derived from "transfer policies and procedures which no longer exist."
 {¶ 10} We agree with ODE that the historical and legal underpinnings of Zellner no longer justify its policy of abstention, and, more importantly, that the Ohio Supreme Court would decide the issue differently today. Further, we agree with ODE that the procedural posture of Zellner is sufficiently different to further justify distinguishing that case.
 {¶ 11} Foremost in Zellner was the Ohio Supreme Court's view that "[i]n the area of school desegregation, the federal district courts were designated as the proper forum in Brown v. Bd. of Edn. of Topeka (1955),349 U.S. 294, 75 S.Ct. 753 * * * and have been harvesting familiarity and expertise in the area since that time." Zellner, supra, at 201,297 N.E.2d 528. But since Zellner, it cannot be denied that the federal commitment to desegregation has steadily declined. See, generally, Orfield, Eaton, and the Harvard Project on School Desegregation, Dismantling Desegregation: The Quiet Reversal of Brown v. Board ofEducation (1966). Indeed, in Board of Education v. Dowell (1991),498 U.S. 237, 111 S.Ct. 630, the United States Supreme Court allowed federal courts to end their supervision of long-running desegregation suits, notwithstanding the risk of resegregation.
 {¶ 12} As one commentator noted six years later, in 1997, "Federal courts, frustrated by years of struggling to desegregate the public schools, are retreating from their commitment." Moran, Milo's Miracle (1977), 29 Conn.L.Rev. 1079. Conversely, as observed by another commentator, desegregation, once almost exclusively the subject of federal litigation, has become a state-court issue as well. "During the four decades since Brown, the debate about school desegregation had been waged primarily in the federal courts. As the Supreme Court continues its slow retreat from this area of law, the locus of debate over school desegregation has shifted to state legislatures, state courts, and local school boards, where policy arguments about the educational and social benefits of pupil mixing have assumed increasingly greater relevance." Douglas, 1997 Survey of Books Relating to the Law: III. Race, Culture, and the Law: The End of Busing? (1997), 95 Mich.L.Rev. 1715.
 {¶ 13} In sum, we conclude that the primary assumption of Zellner,
that the federal courts have been designated the proper forum to litigate desegregation claims, is no longer applicable given subsequent developments in this area of jurisprudence.
 {¶ 14} Further, along with the decline of the federal courts' role in policing segregation, there has been since Zellner, as ODE points out, a broader trend in federal courts to abstain from matters that are already being litigated in state court. In Middlesex, supra, the United States Supreme Court extended Younger abstention to include both criminal and noncriminal judicial proceedings when important state interests are involved. As the Court made clear in Middlesex, "Younger v. Harris * * * and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances. The policies underlying Younger abstention have been frequently reiterated by this Court. The notion of `comity' includes `a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.' [Citations omitted.] Minimal respect for the state processes, of course, precludes the presumption that the state court will not safeguard federal constitutional rights."Middlesex, supra, at 431, 102 S.Ct. 2515 (emphasis in original).
 {¶ 15} The board, it should be recognized, continues to insist that it will not be given a full opportunity to litigate its equal-protection claims in the state administrative process. In support of this argument, the board points to Ohio law that precludes an administrative agency from declaring state statutes unconstitutional. See State ex rel. ColumbusSouthern Power Co. v. Sheward (1992), 63 Ohio St.3d 78, 82, 585 N.E.2d 380, citing S.S. Kresge Co. v. Bowers (1960), 170 Ohio St. 405, 166 N.E.2d 139. But as Sheward makes clear, the inability to strike down legislation as unconstitutional does not constitute a bar to a party raising constitutional issues and then pursuing those issues on appeal. Id.
 {¶ 16} Further, as ODE points out, the Ohio Administrative Code was amended in 1981 to specifically include "racial isolation" as one of the factors that the administrative process is now designed to address. See Ohio Adm. Code Sections 3301-89-02(B)(2)(a) through (C) and 3901-89-03(B)(5). This being so, we perceive no impediment to the board making the necessary record before the administrative body. Indeed, other than to cite Sherward, the board makes no cogent argument to suggest that it would be forced to proceed through the state process on a truncated record. Nor does the board present a compelling reason for concluding that the appeals process provided by statute (first to the Franklin County Court of Common Pleas, then to the Tenth Appellate District, and then, if granted, to the Ohio Supreme Court, see R.C. 119.12) would not properly safeguard the federal constitutional rights upon which its equalprotection claims are based. Indeed, the board's insistence on litigating the issue of the proposed transfer only in federal court strikes us as more a desire to forum-shop rather than an appeal to comity and judicial economy.
 {¶ 17} Finally, Zellner may be distinguished factually because in that case there had already been administrative approval of the proposed transfer when the board filed its federal action. Here, due to the board's peremptory decision to ignore ODE's request for information, the administrative process has been stymied before even a preliminary decision has been reached. As ODE points out, it is entirely possible that the proposed transfer will be denied. Although the board appears to have a strict rule opposing any transfer, ODE cautions that it "does not alter school districts on a whim" and notes that the determination is governed by a "comprehensive regulatory and statutory scheme" involving both administrative and judicial review. At this point, therefore, the board's equal-protection claims are entirely prospective and do not present any case or controversy that would invoke the jurisdiction of the federal court.[3]
 {¶ 18} For all these reasons, we agree with the trial court that there existed no legal impediment to the state process going forward on the proposed transfer. The board's first assignment of error is accordingly overruled.
 {¶ 19} We also reject the premise of the board's second assignment of error that the trial court somehow failed to rule on its claim for declaratory judgment. The board sought a simple declaration that the state action had to be enjoined based on Zellner. The court correctly ruled that neither Ohio law nor the evidence presented at trial justified the board's position. No further elaboration was needed.
 {¶ 20} Accordingly, the board's second assignment of error is also overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Doan, P.J., and Painter, J., concur.
[1] Though pending at the time the Board's complaint was tried to the bench, the federal action, see citation in text, has since been dismissed pursuant to ODE's motion for judgment on the pleadings. The case is presently on appeal to the United States Court of Appeals for the Sixth Circuit.
[2] The decision of the federal district court dismissing the board's federal complaint has been appended to ODE's appellate brief. Because the district court's decision came afterward and was not part of the record before the trial court, we cannot decide this appeal on the basis of that decision. See State v. Ishmael (1978), 54 Ohio St.2d 404, 377 N.E.2d 500, syllabus. Having said this, however, we are not restrained from noting, parenthetically, that one of the reasons the district court dismissed the board's federal action was the extension of Younger abstention in NewOrleans and Middlesex.
[3] Again, given the limitations placed upon us by Ishmael, see fn. 2, supra, we note only parenthetically that the lack of ripeness and the failure to present a case or controversy were additional reasons for the federal court's dismissal of the board's federal action.