United States Court of Appeals, Eleventh Circuit.

No. 94-9355.

Jerry LOCKETT, et al., Plaintiffs-Appellants,

v.

BOARD OF EDUCATION OF MUSCOGEE COUNTY SCHOOL DISTRICT, GEORGIA, et al., Defendants-Appellees.

May 5, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 64-991-COL), J. Robert Elliott, Judge.

ON PETITION FOR REHEARING AND SUGGESTION OF REHEARING EN BANC

Before COX and BARKETT, Circuit Judges, and MOORE[*], Senior District Judge.

PER CURIAM:

The Board of Education of Muscogee County, Georgia ("school board") petitions for panel rehearing. We grant the petition and substitute the following opinion for the previous opinion reported at 92 F.3d 1092 (11th Cir.1996).

I. *Overview*

Plaintiffs appeal the district court's final dismissal of their action and declaration that the school board has eliminated its dual education system, thereby achieving unitary status. Finding that the district court did not clearly err, we affirm.

II. *Background*

Plaintiffs, who were black schoolchildren, filed this class action in 1964 seeking desegregation of Muscogee County schools. The district court twice denied Plaintiffs relief, and the Fifth Circuit affirmed both denials. *Lockett v. Board of Educ. of*

[*]Honorable John H. Moore, II, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

*Muscogee County,* 391 F.2d 272 (5th Cir.1968); *Lockett v. Board of Educ. of Muscogee County,* 342 F.2d 225 (5th Cir.1965).

The district court revisited the case in 1971 after the Supreme Court decided *Green v. School Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). It ordered the school board to present and implement a desegregation plan consistent with the *Swann* principles. *Lockett v. Board of Educ. of Muscogee County,* 442 F.2d 1336 (5th Cir.1971). In response, the school board submitted the following plan:

AMENDED PLAN TO DESEGREGATE THE SCHOOLS OF MUSCOGEE COUNTY, GEORGIA

The [school board,] in continuation of its effort to unify its schools to eliminate every vestige of discrimination because of race or color of its students and to maintain a fully desegregated system, hereby adopts this Amended Plan of Desegregation so as to fully comply with the law in such cases made and provided. The percentage of white and Negro students attending the school [sic] in this County are approximately 70% white and 30% Negro, and it is the purpose and intent of this Board to obtain approximate proportionate representation of each race in each school in the most efficient manner;

NOW, THEREFORE, BE IT RESOLVED:

. . . . .

*STUDENT ASSIGNMENT*

All white students, equal in number to 70% of the capacity of the school to which they have been assigned, living nearest to said school, and all Negro students, equal in number to 30% of the capacity of the school to which they have been assigned, living nearest to said school, shall attend said school for the year beginning in September, 1971.

All other students assigned to said school shall be assigned by the Superintendent and his staff to the school nearest to the residence of said student which does not then have its quota of white or Negro students as above stated.

All students who have not been assigned to any school for the current Fall term, or who later enter the School System,

shall be assigned by the Superintendent and his staff to the school nearest the residence of said student which then has space available and has less than its quota of white or Negro students, as the case may be, then assigned to said school.

There shall be no transfer or assignment of any student during the entire school year, except in case, absent the consideration of race, a change is educationally called for or where compelling hardship or other good reason is shown by the student.

In school years after the school year beginning in September, 1971, the Board of Education, prior to the end of such school year, shall determine the approximate percentage of white and Negro students attending the school in this District and assignment of students shall be made as above provided so that the approximate number of white and Negro students in each school shall be substantially the same as the percentage of white and Negro students in the entire School System.

The school board amended this plan in 1972. The amendment exempted first graders and kindergartners and stated that the "quota or percentage of white and Negro students in each school in the next school term shall be substantially the same as is the percentage of white and Negro students in the entire school system at the end of the current school term." The district court approved both the proposed plan and the 1972 amendment by court order and retained jurisdiction to supervise the school board.

In furtherance of the plan's goals, the school board implemented student reassignment and attendance zone adjustments. By 1973, the proportion of majority to minority students in 57 of the 64 Muscogee County schools was within 10% of the proportion of the races in the County as a whole, and 5 schools fell within a 20% range. Roughly the same compositions were maintained through 1977.

Toward the end of the 1970s, the school board began reducing the number of student reassignments and attendance zone adjustments. At the same time, county demographics began to

change, resulting in racially polarized residential areas, a decrease in the number of white students, and an increase in the number of black students. By the mid-1980s, the racial compositions within many of the schools were disproportionate with the county-wide student racial composition, and by 1991, several racially identifiable schools existed.

Plaintiffs therefore moved in 1991 for an injunction and an order directing the school board to take whatever action necessary to achieve proportionate student compositions. The district court denied the motion as moot because the original class of Plaintiffs were no longer students. This court reversed and remanded for consideration of the motion on its merits. *Lockett v. Board of Educ. of Muscogee County Sch. Dist.*, 976 F.2d 648 (11th Cir.1992). Before the district court decided the motion on remand, the school board met with black and white citizens and Parent-Teacher Association representatives from majority black and majority white schools. With support from these citizens and representatives, the school board implemented a neighborhood-school plan that eliminated cross-district busing and called for students to be assigned to local neighborhood-schools. The school board also proposed magnet programs and majority-to-minority transfer programs to off-set any negative impact that the neighborhood assignment plan might have on racial composition within the schools. Plaintiffs moved to enjoin the neighborhood-school plan in 1992 and in 1993. The district court denied both motions, finding no irreparable harm.

The school district then moved for final dismissal of the 1971 order and for a declaration of unitary status in an effort to have

the district court divest itself of jurisdiction.  Following an evidentiary hearing, the district court granted the motion.

### III. *Standard of Review*

We review a district court's declaration that a school system has achieved unitary status under the clearly erroneous standard. *Jacksonville Branch, NAACP v. Duval County Sch. Bd.,* 883 F.2d 945, 952 n. 3 (11th Cir.1989).  Under this standard, we are not entitled to "reverse the finding of the trier of fact simply because [we are] convinced that [we] would have decided the case differently. [We] overstep[ ] the bounds of [our] duty under Rule 52(a) if [we] undertake[ ] to duplicate the role of the lower court....  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

### IV. *Discussion*

In *Brown v. Board of Ed.,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (*Brown I* ), the Supreme Court recognized that state-compelled segregation in schools violates the Fourteenth Amendment's Equal Protection Clause.  To effectuate  *Brown I's* mandate, the Supreme Court ordered district courts to supervise school boards that had practiced *de jure* segregation in their desegregation efforts.  *Brown v. Board of Ed.,* 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955) (*Brown II* ).  District courts maintained supervision by issuing remedial orders and asserting jurisdiction over school boards to ensure compliance with those orders.

The Supreme Court intended this federal supervision of local school systems to be a temporary measure. *Board of Educ. of Oklahoma City v. Dowell,* 498 U.S. 237, 247, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991). Since the legal justification for such supervision is a constitutional violation by local authorities, a district court must divest itself of jurisdiction when the constitutional violation has ceased and when local authorities have operated in compliance with a desegregation decree for a reasonable period of time. *Id.* at 248, 111 S.Ct. at 637; *see also Freeman v. Pitts,* 503 U.S. 467, 489, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) ("[T]he ultimate objective [is] to return school districts to the control of local authorities."). A district court's decision to divest itself of jurisdiction "recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.' " *Dowell,* 498 U.S. at 247, 111 S.Ct. at 637 (citations omitted). Counterbalancing this recognition is the acknowledgment that "the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of *de jure* segregation have been eliminated." *Freeman,* 503 U.S. at 490, 112 S.Ct. at 1445.

To ensure that local authorities are not continuing to practice discrimination, a district court's determination of whether local authorities have complied with a desegregation decree involves a careful assessment of the facts. *Id.* at 474, 112 S.Ct.

at 1437.  Utilizing sound discretion after a such a careful factual assessment, a district court must determine (1) whether the local authorities have eliminated the vestiges of past discrimination to the extent practicable and (2) whether the local authorities have in good faith fully and satisfactorily complied with, and shown a commitment to, the desegregation plan.  *Lee v. Etowah County Bd. of Educ.,* 963 F.2d 1416, 1425 (11th Cir.1992) (citing *Dowell,* 498 U.S. at 249-50, 111 S.Ct. at 638).

In determining whether the local authorities have eliminated the vestiges of *de jure* segregation as far as practicable, a district court must examine six facets of school operation: student assignments, faculty assignments, staff assignments, transportation, extra-curricular activities, and facilities. *Dowell,* 498 U.S. at 245, 111 S.Ct. at 636 (quoting *Green,* 391 U.S. at 435, 88 S.Ct. at 1693 (1968)).  In its discretion, a district court may consider other facets.  *Freeman,* 503 U.S. at 492, 112 S.Ct. at 1446.

Here, the district court limited the bulk of its discussion to student assignments because the parties agreed that the school system has eliminated the vestiges of *de jure* segregation as far as practicable in the areas of faculty assignments, staff assignments, transportation, extra-curricular activities, and facilities.[1]  We do the same.

Where, as here, a school board has a history of practicing segregation, a district court must presume that substantially

---

[1]The district court, in a proper exercise of its discretion, did not consider other facets of school operations such as quality of education, and neither party requested that it do so.

disproportionate racial compositions within the schools is constitutionally violative. *Swann,* 402 U.S. at 25, 91 S.Ct. at 1281. To overcome this presumption, a school board must prove that the imbalances are not the result of present or past discrimination on its part. *Id.*

The school board sought to prove through expert witnesses that the current student imbalances and imbalances during the 1980's were not the result of present or past discrimination. Those witnesses testified that the current racial imbalances were the result of dramatic demographic changes in Muscogee County, such as an increase in the number of black school-age children and a decrease in the number of white school-age children. The demographic change, according to one expert, was a result of factors over which the school board had no control, such as a decrease in the white fertility rate, a difference in purchasing power between white and black families, a preference of white and black families to live in neighborhoods composed of families of a similar race, and the location of housing projects. (R2-19-21). Based on this evidence and the fact that other experts did not contradict this evidence, the district court concluded that the school board proved that the imbalances were "the result of voluntary housing patterns and demographic change." (R2-23).

The district court's conclusion was not clearly erroneous. It was based on expert opinion "consistent with the mobility that is a distinct characteristic of our society." *Freeman,* 503 U.S. at 493, 112 S.Ct. at 1447. And while

> [i]n one sense of the term, vestiges of past segregation by
> state decree do remain in our society and in our schools....

> [as a stubborn fact of history, we must not] overstate its consequences in fixing legal responsibilities....  It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation[,] [a]nd the law need not proceed on that premise.

*Id.* at 495-96, 112 S.Ct. at 1448.  Further, "[a]s the *de jure* violation becomes more remote in time and ... demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system.  The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith [commitment to a desegregation plan.]"  *Id.* at 496, 112 S.Ct. at 1448.

A good faith commitment to a desegregation plan also demonstrates to parents, students, and the public that students will no longer suffer injury or stigma.  At the same time, it "enables the district court to accept the school board's representation that [the school board] has accepted the principle of racial equality and will not suffer intentional discrimination in the future."  *Id.* at 498, 112 S.Ct. at 1449.  To determine if a school board has shown a good faith commitment to a desegregation plan, a district court should, among other things, consider whether the school board's policies "form a consistent pattern of lawful conduct directed to eliminating earlier violations."  *Id.* at 491, 112 S.Ct. at 1446.

Here, the district court concluded that the school board has in good faith shown a commitment to, and has fully and satisfactorily complied with, the desegregation plan generally and in those aspects specifically related to student assignments.  The

district court, which has monitored the actions of the school board for over 30 years, reached this conclusion based on several findings. First, it found that it has never had to enjoin or sanction the school board. Second, it found that the school board never failed to comply with a court order.[2] Third, it found that the school board took actions to further desegregation which went above and beyond what the 1971 order as amended required. Fourth, it found that the school board kept desegregation of its schools at a level not surpassed by any school district in the country for ten years, even in the face of countervailing demographic factors. Fifth, it found that the school board implemented magnet programs which, at least in one instance, helped to racially balance an otherwise unbalanced school. Sixth, it found that the school board adopted the neighborhood assignment plan only after listening to the views of black and white citizens (both groups favored the plan) and PTA representatives from majority white and majority black schools (both groups opposed an alternative plan).[3] Seventh,

---

[2]As part of this finding, the district court interpreted its 1971 order as amended to require the school district only to achieve proportionate representation for the 1972-73 school year. We should give effect to that interpretation. *See Cornist et al. v. Richland Parish School Board,* 495 F.2d 189, 191 (5th Cir.1974) (stating that in a desegregation case, the district judge "construed his own order, as he was entitled to do"); *Vulcan Tools of Puerto Rico v. Makita USA, Inc.,* 23 F.3d 564, 566 (1st Cir.1994) ("[W]e are loathe to upset a district court's interpretation of its own order.").

[3]We should not treat the adoption of the neighborhood assignment plan as a breach of good faith on the part of the school board. In *Lockett v. Board of Educ. of Muscogee County,* No. 93-8966 (11th Cir. July 21, 1994), we affirmed the district court's decision allowing the school district to continue the plan as consistent with the underlying desegregation plan. *Cf. Dowell,* 498 U.S. at 249 n. 1, 111 S.Ct. at 638 n. 1 ("The Court of Appeals viewed the Board's adoption of [a particular plan] as

it found that the school board implemented a majority to minority transfer program in 1992 to offset any racial impact that the neighborhood assignment plan could have. (R2-40). In addition to these specific findings, the district court noted generally that "[e]very expert who testified in this case expressed praise in varying degrees for the desegregation efforts of the [school board]." (R. 2-55.) The district court's findings were based on uncontradicted evidence and fully support the district court's conclusion that the school board has shown a good faith commitment to and compliance with the desegregation plan. This conclusion was not clearly erroneous.

## V. *Conclusion*

The district court's conclusions that the school board has eliminated the vestiges of *de jure* segregation as far as practicable and that the school board has shown a good faith commitment to and compliance with the desegregation plan were not clearly erroneous. Accordingly, we affirm the district court's final dismissal and declaration that the school board has attained unitary status.

AFFIRMED.

BARKETT, Circuit Judge, dissenting:

Although I believe this is a very close case and guidance in this area of the law is vague, I respectfully differ from the court's decision to rehear this case because I am concerned about

---

a violation of its obligation under the injunction, and technically it may well have been. But ... we do not think that the Board should be penalized for relying on the express language of that order.").

the Muscogee County School District's actions, and inaction, during the last fifteen years that it was subject to the desegregation decree.

Regardless of the age of a desegregation decree, such a decree may only be terminated upon a showing that a school district has eliminated all vestiges of prior *de jure* segregation to the maximum extent practicable and has complied in good faith with both the decree and the spirit of *Brown* 's mandate.[1] *Board of Ed. of Oklahoma City v. Dowell,* 498 U.S. 237, 249-50, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991); *Lee v. Etowah County Bd. of Educ.,* 963 F.2d 1416, 1425 (11th Cir.1992).

No one disputes that *de facto* segregation now exists in the school district. It is also clear that prior *de jure* segregation resulted from unconstitutional practices by the school district. The school district had the burden of demonstrating that the current imbalances are not vestiges of those past policies or practices. *See Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 25, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). The district court determined that the racial imbalances were not caused by the school

---

[1]In its Petition for Rehearing, the School Board repeatedly suggests that a school district satisfies its obligations once it adopts a racially neutral system of student assignment. *See Petition for Rehearing* at 7 ("federal courts simply have no authority to enforce orders solely to achieve racial balance once a racially neutral system of student assignment has effectively been adopted") & 12 ("there is no affirmative duty [to remedy racial imbalances] after a school system has successfully implemented a school desegregation plan"). However, I believe Petitioner confuses the means of its remedial obligations with the ends. Although implementing a racially neutral attendance pattern is a necessary remedial device, "[a] remedy is justifiable only insofar as it advances *the ultimate objective of alleviating the initial constitutional violation." Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445 (emphasis added).

system but, in doing so, focused only on demographic changes in the county. The court failed to consider whether the school board's total curtailment of any desegregation efforts after about 1980 helped preserve or perpetuate the effects of its prior unconstitutional policies. The district court's narrow approach erroneously assumed that as long as a school district can point to some force not directly related to a school district's overt actions which is causing or exacerbating racial imbalances, then the resulting imbalance is not traceable to past practices. I do not believe that this approach comports with the proper burdens of proof or the analytic framework set out in *Freeman v. Pitts,* 503 U.S. 467, 494, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108 (1992).