United States Court of Appeals,

Eleventh Circuit.

No. 94-9355.

Jerry LOCKETT, et al., Plaintiffs-Appellants,

v.

 BOARD OF EDUCATION OF MUSCOGEE COUNTY SCHOOL DISTRICT, GEORGIA, et al., Defendants-Appellees.

Aug. 28, 1996.

Appeal from the United States District Court for the Middle District of Georgia. (No. 64-991-COL), J. Robert Elliott, Judge.

Before COX and BARKETT, Circuit Judges, and MOORE[*], Senior District Judge.

BARKETT, Circuit Judge:

Plaintiffs-appellants Jerry Lockett, et al., appeal the district court's order vacating all outstanding injunctions against the Board of Education of Muscogee County, Georgia ("school district"), and declaring that the school district had successfully eliminated all vestiges of its dual education system and had exhibited good faith in discharging its constitutional duties to desegregate its schools.

Background

Plaintiffs, African-American students attending public school in Muscogee County, commenced this class action over thirty-one years ago, seeking to enjoin the Muscogee County school board from operating a dual education system, and seeking a court-ordered reorganization of the school system. In 1965 and 1968 the district court denied Plaintiffs relief and those denials were affirmed on

[*]Honorable John H. Moore II, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

appeal. *Lockett v. Board of Educ. of Muscogee County,* 391 F.2d 272 (5th Cir.1968); *Lockett v. Board of Educ. of Muscogee County,* 342 F.2d 225 (5th Cir.1965). In 1971, however, following the decisions in *Green v. School Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), this court ordered the school district to present and implement a desegregation plan consistent with the principles established in *Swann, Singleton v. Jackson Mun. Sch. Dist.,* 419 F.2d 1211 (5th Cir.1969), and *Carter v. West Feliciana Parish Sch. Bd.,* 432 F.2d 875 (5th Cir.1970). *See Lockett v. Board of Educ. of Muscogee County,* 442 F.2d 1336 (5th Cir.1971). In response to this court's order, the school district submitted a plan to the district court to achieve student and faculty racial compositions proportionate to the racial compositions of their respective populations county-wide. That plan reads in pertinent part:

AMENDED PLAN TO DESEGREGATE THE SCHOOLS OF MUSCOGEE COUNTY, GEORGIA

The Board of Education of Muscogee County School District, in continuation of its effort to unify its schools to eliminate every vestige of discrimination because of race or color of its students and to maintain a fully desegregated system, hereby adopts this Amended plan of Desegregation so as to fully comply with the law in such cases made and provided. The percentage of white and Negro students attending the school in the County are approximately 70% white and 30% Negro, and it is the purpose and intent of this Board to obtain approximate proportionate representation of each race in each school in the most efficient manner;

NOW, THEREFORE, BE IT RESOLVED:

*STUDENT ASSIGNMENT*

All white students, equal in number to 70% of the capacity of the school to which they have been assigned, living nearest to said school, and all Negro students, equal

in number to 30% of the capacity of the school to which they have been assigned, living nearest to said school, shall attend said school for the year beginning in September, 1971.

All other students assigned to said school shall be assigned by the Superintendent and his staff to the school nearest to the residence of said student which does not then have its quota of white or Negro students as above stated.

All students who have not been assigned to any school for the current Fall term, or who later enter the School System, shall be assigned by the Superintendent and his staff to the school nearest the residence of said student which then has space available and has less than its quota of white or Negro students, as the case may be, then assigned to said school.

There shall be no transfer or assignment of any student during the entire school year, except in case, absent the consideration of race, a change is educationally called for or where compelling hardship or other good reason is shown by the student.

*In school years after the school year beginning in September, 1971, the Board of Education, prior to the end of such school year, shall determine the approximate percentage of white and Negro students attending the school in this District and assignment of students shall be made as above provided so that the approximate number of white and Negro students in each school shall be substantially the same as the percentage of white and Negro students in the entire School System.*

The approved plan included a provision which created a continuing obligation to make student assignments in proportion to the county-wide racial composition consistent with the 1971 order. The school district's proposal was approved by court order on July 14, 1971 ("1971 order"), and accordingly the parties were subject to the court's supervision until such time as the district court dismissed the order.[1]

---

[1] In 1972 the order was amended to exempt first grade and kindergarten students from the plan. The 1972 amendment also stated:

> The quota or percentage of white and Negro students in each school in the next school term shall be substantially the same as the percentage of white and

Throughout the 1970s the school district implemented student reassignment and attendance zone adjustments in order to achieve its goal of proportionate student representation, and submitted annual reports describing its efforts and their effects on the racial composition of the schools. By about 1973, 57 of the 64 schools had racial compositions within a 10% range of the county-wide student racial composition, and an additional 5 schools fell within a 20% range of the county-wide ratio. The school district maintained relatively constant statistical racial compositions within its schools up through the 1976-77 academic year. Similarly, the racial compositions of faculty and staff within most of the schools were within a 15% range of the county-wide average from 1972 to 1980. The record does not contain specific data describing the relative quality of facilities, transportation, or extracurricular activities throughout the 1970s and 1980s.

By the end of the 1970s the school district began reducing the number of student reassignments and attendance zone adjustments. During the same period that the district was curtailing its affirmative desegregation efforts, the demographics of the county began to shift, which resulted in a decrease in the number of white students, an increase in the number of black students, and racially

Negro students in the entire school system at the end of the current school term.

We find unpersuasive the school district's argument that under this language, the plan's proportionate representation requirement was not applicable to any school year after 1972-73. Indeed, the school district itself continued to submit data on the racial composition within its schools well into the 1980s.

polarized residential areas.  By the mid-1980s the racial compositions within many schools again were statistically disproportionate with the county-wide ratios, and indeed, by 1991 a number of racially identifiable schools existed.[2]  Similarly, by the mid-1980s the number of schools with acceptable faculty compositions was declining.  At no time prior to the commencement of the current proceedings did the school district attempt to dismiss or modify the 1971 order.

In 1991, Plaintiffs, citing the increase in racially identifiable schools in the district, filed a motion seeking an injunction and an order directing the school district to take whatever action necessary to achieve proportionate representation. The district court dismissed the motion as moot because the original class of plaintiffs were no longer students;  however, in November of 1992, this court remanded the motion for consideration on its merits pursuant to *Graves v. Walton County Bd. of Educ.,* 686 F.2d 1135 (5th Cir., Unit B, 1982).  *Lockett v. Board of Educ. of Muscogee County Sch. Dist.,* 976 F.2d 648 (11th Cir.1992).  Prior to remand, however, the school district implemented a neighborhood school plan, whereby cross-district busing would be eliminated and elementary students would be assigned to schools in their local neighborhoods, thus potentially aggravating the racial imbalances. On May 21, 1992, Plaintiffs filed a motion seeking to enjoin

_____

[2]According to the school district's expert on desegregation, by 1993, 23 of the 33 elementary schools, 3 of the 8 middle schools, and 2 of the 7 high schools were no longer within a 20% range of the county-wide student racial percentages.  Only 15 of the 48 schools were within a 15% range of the county-wide racial percentage, whereas, 12 schools had student populations that were more than 90% of one race.

implementation of the new neighborhood assignment plan during the pendency of the appeal; however, the district court denied the motion finding no irreparable harm, relying in part on the school district's proposal to institute a magnet program and a majority-to-minority transfer program. In 1993, Plaintiffs again moved to enjoin the district's assignment plan, and again, the court denied their motion. Finally, on June 7, 1993, the school district moved for a final dismissal and a declaration of unitary status.

On November 18, 1994, following an evidentiary hearing, the district court granted the school district's motion, finding: (1) the school district effectively had disestablished its dual system in 1963; (2) the school district effectively had desegregated its schools in the 1971-72 school year; (3) the school district had maintained a high degree of racial balance in student assignments for a longer period of time than most large counties in the country; and (4) the racial imbalance exhibited in the 1980s and 1990s, and present today, resulted from demographic changes over which the school district had no control. Based upon these findings, the court ruled that the Muscogee County School District had satisfied its burden of showing that it had successfully eliminated the vestiges of the old dual system to the maximum extent practicable, and that the school district had exhibited a good faith commitment to the discharge of its constitutional duties.

## Discussion

In 1954, the Supreme Court recognized that state-compelled

segregation in education violates the Equal Protection Clause of the Fourteenth Amendment. *Brown v. Board of Ed.,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) ("*Brown I* "). However, the Court did not order the immediate eradication of constitutionally violative dual school systems. Instead, the Court ordered district courts to supervise school systems that had previously practiced *de jure* segregation in their efforts to effectuate the constitutional mandate of *Brown I* "with all deliberate speed." *Brown v. Board of Ed.,* 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955) (" *Brown II* "). District courts were instructed to assert jurisdiction over school systems in order to ensure compliance with the courts' remedial orders and the Constitution until such time as a district court determined that the vestiges of past discrimination had been eliminated to the maximum extent practicable. *Swann,* 402 U.S. at 15, 91 S.Ct. at 1275. To this end, a school district is obligated to comply in good faith with the entire desegregation decree throughout the life of the order, and must "take whatever [affirmative] steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch," *Green,* 391 U.S. at 437-38, 88 S.Ct. at 1693-94. The purpose of such remediation, however, is to eliminate the vestiges of state-compelled dual systems, and not to remedy racial imbalances unrelated to *de jure* segregation. *Freeman v. Pitts,* 503 U.S. 467, 494, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108 (1992).

Forty-one years have passed since *Brown I* and *Brown II,* yet a number of school systems, as well as the district courts that

retain jurisdiction over them, continue to struggle with the scope and duration of their duties under *Brown II* and its progeny. In this case the primary issue is whether Muscogee County's school district fulfilled its obligations under the district court's 1971 desegregation order, and whether the district court correctly terminated its jurisdiction over the case.

The school district argues, and the district court agreed, that unitary status had been achieved in around 1980, and therefore, the school district's obligations under the 1971 order terminated at that time even though unitary status was not actually declared until 1994. The school district also contends that the district court did not err in finding that the racial imbalances that currently exist are the result of demographic shifts, and are not the vestiges of its prior dual system.

Plaintiffs argue that the school district's obligation to make affirmative efforts to desegregate the school system commenced in 1971 and did not end until the district court declared unitary status in 1994. During that time, however, the school district failed to make good faith efforts to desegregate, as exemplified by the district's curtailment of desegregation programs after 1980, its refusal to implement majority-to-minority transfer programs, and its implementation of a neighborhood school plan, which increased racial imbalances. Thus, according to Plaintiffs, the district court ignored the school district's failure to satisfy its duties under the court order between about 1980 and 1994, the year that the court actually declared unitary status.

Plaintiffs also argue that the school district failed to

proffer sufficient evidence to rebut the presumption that schools that are racially identifiable are vestiges of prior unconstitutional segregation. Plaintiffs argue that in ruling that the current imbalances are due primarily to demographic shifts, the district court failed to consider the adverse actions of the school district, including the curtailment of student transfers and attendance zone adjustments, the siting of schools, and the use of mobile classrooms. Moreover, Plaintiffs claim that because the school district failed to keep statistics on the effects of these actions, Plaintiffs could not rebut the demographic data that the school district presented.

Because the Muscogee County School Board did not seek a declaration of unitary status prior to the current litigation, our inquiry into whether the school district has attained unitary status depends upon an examination of the school district's desegregation efforts and their effects from 1971 until the present. It is well-established that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *Celotex Corp. v. Edwards,* --- U.S. ----, ----, 115 S.Ct. 1493, 1498, 131 L.Ed.2d 403 (1995). The school district was subject to the 1971 court order until such time as the district court vacated that order by declaring that the school district had achieved unitary status and complied with the order in good faith. *Pasadena City Bd. of Ed. v. Spangler,* 427 U.S. 424, 439-40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976). Thus, to the extent that the district court ignored the

school district's actions after 1980, while the district was still subject to the 1971 order, the court erred.

In determining whether a school district has complied with the constitutional mandate of *Brown I* and *Brown II,* a district court must examine student assignments, faculty and staff assignments, facilities, extra curricular activities, and transportation. *Green,* 391 U.S. at 437-38, 88 S.Ct. at 1693-94; *Board of Ed. of Oklahoma City Public Sch. v. Dowell,* 498 U.S. 237, 250, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991). More recently, courts have also considered the relative quality of education offered to black and white students. *Freeman,* 503 U.S. at 492, 112 S.Ct. at 1446. Where a school district has a history of practicing segregation, substantially disproportionate racial compositions within the schools is presumed to be constitutionally violative, and the school district bears the burden of proving that the imbalances are not the result of present or past discriminatory action on its part. *Swann,* 402 U.S. at 25, 91 S.Ct. at 1281. In determining whether the school district has satisfied that burden, a district court should consider (1) whether the racial imbalances are traceable, in a proximate way, to constitutional violations, (2) whether the school district has exhibited a record of full and satisfactory compliance with the decree, and (3) "whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the laws and the constitution that were the predicate for judicial intervention in the first place." *Freeman,* 503 U.S. at 491, 112

S.Ct. at 1446.

The district court found, and the school district concedes, that student assignments in the Muscogee County schools currently are racially unbalanced. The parties also agree that the school district previously had operated an unconstitutional dual system. Thus, the first issue on appeal is whether the district court clearly erred in ruling that the school district satisfied its burden of showing that current racial imbalances are not caused by prior unconstitutional practices, but instead, are the result of demographic shifts within the county and the student population.

The district court in *Freeman* was presented with a factually similar inquiry.[3] In that case, the DeKalb County School System, which had previously practiced *de jure* segregation, voluntarily proposed a plan to desegregate its school system. The district court approved the proposed plan through a 1969 consent order which called for the closing of all former *de jure* black schools and the reassignment of students among the remaining schools. In 1976 the district court ordered the school system to expand its majority-to-minority student transfer program, to establish a bi-racial committee to oversee the transfer program and boundary line changes, and to reassign faculty to achieve racial balance. In 1983, the district court again ordered an adjustment to the majority-to-minority transfer program. In 1986, the school district filed a motion for final dismissal of the court order, and a declaration that the district had achieved unitary status.

_____

[3]For the facts underlying *Freeman,* and the district court's analysis, see *Freeman,* 503 U.S. at 474-85, 112 S.Ct. at 1437-43.

Although the motion for dismissal was filed at a time when student racial compositions in the schools were unbalanced, the school system argued that the imbalances were due to demographic changes independent of prior unconstitutional practices.

In analyzing whether the imbalances were attributable to the dual system, or indeed, whether the prior *de jure* school segregation had contributed to the county's demographics, the district court focused on the interaction between the school system's policies and the demographic shifts. To determine whether the school district had "accomplished maximum practical desegregation," the court examined the specific steps that the school system had taken to *combat* the effects of demographic shifts on the racial composition of the schools, particularly noting its majority-to-minority transfer program, magnet school program, and other racially integrated scholastic programs. Finding that the school district's affirmative efforts to desegregate had little or no offsetting effect on the racial mix, the district court determined that the racial imbalances resulted almost completely from the demographic shifts, and thus the imbalances were not due to the school board's actions or inaction. Thus, the court recognized that the impact of demographics on racial composition can only be assessed relative to the other factors contributing to the racial composition in the schools. In affirming the district court's findings, the Supreme Court ratified the district court's approach for analyzing the causes of racial imbalance within schools.

In this case, the district court found that at least for the

first half of the 1970s the Muscogee County school district had attained acceptable statistical racial compositions within its schools. Having made that finding, the district court then determined that any later imbalances were caused, not by factors over which the school district had control, but by the demographic shifts which took place after 1980. Consequently, the district court effectively ruled that the school district was under no obligation to make affirmative desegregation efforts after 1980. The district court apparently assumed that once a school system has achieved acceptable racial compositions within its schools, it has no ongoing obligation to try to offset later imbalances caused by circumstances over which it has no control. The district court also assumed that demographic shifts are necessarily independent of prior unconstitutional practices.

The district court, however, made some erroneous assumptions. First, a school district does not escape its obligation to make affirmative efforts to remedy racial imbalances simply because the imbalances are caused by circumstances "over which [the school district] has no control"; instead, while under court supervision the school district must make efforts to eradicate all imbalances which are *traceable* to prior *de jure* segregation. *Freeman*, 503 U.S. at 491, 112 S.Ct. at 1446. The school district bears the burden of showing that no such causal link exists, and absent such a showing, the district must continue to make affirmative efforts to remedy racial imbalances while subject to court order. Moreover, in the case of demographic shifts and their resulting racial imbalances, the Supreme Court has recognized that school

segregation is a contributing cause of housing segregation, *Columbus Bd. of Ed. v. Penick,* 443 U.S. 449, 465 n. 13, 99 S.Ct. 2941, 2950 n. 13, 61 L.Ed.2d 666 (1979), and thus, demographic shifts are not necessarily independent of prior unconstitutional practices. Finally, in finding unitary status retroactively, the district court failed to examine the relative quality of facilities, transportation, and extracurricular activities that existed in the 1970s and 1980s, conditions that must be considered in conjunction with student assignments in determining unitary status. Thus, the district court erred to the extent that it held (1) that the school district's obligations to make affirmative efforts under the 1971 order ceased upon achieving statistically acceptable racial compositions in the 1970s; (2) that a school system has no obligation to remedy imbalances caused by circumstances over which the school district has no control; (3) that demographics shifts are never caused by prior *de jure* school segregation; and (4) that unitary status can be determined on student and faculty assignments alone.

The proper analysis requires an examination of the various factors that may have contributed to the current racial imbalance, and to determine whether, *in spite of* the school system's affirmative efforts to accomplish maximum practical desegregation, the impact of demographic shifts still would have resulted in the imbalance. Unlike the situation in *Freeman,* in which the DeKalb County school district had implemented desegregation programs to affirmatively combat demographic shifts, the school district in this case actually reduced the number of student reassignments and

attendance zone changes just as demographic shifts began to adversely affect the racial composition of the schools, and did not implement new desegregation initiatives in their place. Moreover, because of an absence of data, this court has no basis for assessing the arguably adverse impact that the school board's neighborhood assignment plan, grade structure changes, portable classrooms, and student transfers had on racial composition within the schools. Thus, on the record presented, we have no way of assessing the impact of shifting demographics on the current racial compositions compared with other variables, including the school district's actions and inaction, which arguably exacerbated, rather than alleviated, the racial imbalances during the 1980s and 1990s. At the very least, we do not believe that the school district carried its burden of showing that current imbalances, caused by demographic shifts or otherwise, are not the vestiges of unconstitutional practices.

Under the second factor in *Freeman,* this court must look at the degree to which the school district complied with the 1971 order throughout the life of the order. *See Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446; *see also Dowell,* 498 U.S. at 249, 111 S.Ct. at 637 ("[I]n deciding whether to modify or dissolve a desegregation decree, a school board's compliance with previous court orders is obviously relevant."). The terms of the 1971 order, which the school district itself drafted, obligated the school district to annually determine the county-wide racial composition of the students within the district, and to reassign students so that the racial composition within the schools would be

substantially the same as the composition county-wide. Moreover, the explicit purpose of the order was to eliminate every vestige of discrimination and to maintain a fully desegregated system. Although a school district is not constitutionally required to exhibit a particular racial mix at all times, or to make year-by-year adjustments, *Swann,* 402 U.S. at 24, 32, 91 S.Ct. at 1280, 1284, a school district must make affirmative efforts to comply with the desegregation decree until a district court has declared that unitary status has been achieved.

The record in this case shows that the Muscogee County school district did make annual student reassignments and attendance zone adjustments for most of the 1970s. The statistical data cited in the district court's order indicates that for at least six years the district maintained racial compositions within the schools proportionate to the racial composition of the county's entire student population. Thus, the record supports a finding that the school district complied with the court order with respect to student and faculty assignments throughout the 1970s. However, the school district did not request a declaration of unitary status until 1993, and therefore, it had a continuing obligation to abide by the order until such time as the district court modified or vacated the order. The record reflects, and the district court found, that by 1980 the school district stopped making the adjustments it had made in the 1970s, and that the curtailment of desegregation efforts may have contributed to the subsequent racial imbalances. In addition, the school district implemented a neighborhood assignment plan, which required elementary students to

attend local neighborhood schools and eliminated cross-district busing. Not only did the neighborhood plan have the potential to exacerbate segregation, it directly contravened the clear mandate of the order. Thus, the record suggests that although the school district initially complied with the 1971 order, in about 1980 the district unilaterally decided that it had satisfied its obligations, and based upon that decision, it essentially ignored the desegregation decree for the last fourteen years that it was under the court's supervision.

Under the third factor in *Freeman,* before divesting itself of jurisdiction, a district court must determine whether the school district has complied in good faith with the desegregation decree since it was entered and with the constitutional principles it embraces. *Freeman,* 503 U.S. at 497, 112 S.Ct. at 1449. The good faith requirement assures parents, students, and the public that they will be protected against further injuries or stigma, *id.,* by making "it unlikely that the school district would return to its former ways," *Dowell,* 498 U.S. at 247, 111 S.Ct. at 636-37; *see also Morgan v. Nucci,* 831 F.2d 313, 321 (1st Cir.1987) ("a finding of good faith ... reduces the possibility that a school system's compliance with court orders is but a temporary constitutional ritual"). In addition, if the school district has demonstrated its good faith, "[t]he causal link between current conditions and the prior violation is even more attenuated." *Freeman,* 503 U.S. at 496, 497, 112 S.Ct. at 1448, 1449. When a school district has not demonstrated good faith under a plan to remedy violations, the Supreme Court has approved ongoing supervision. *Id.*

As noted above, after the school district had achieved proportionate representation for a number of years, it essentially stopped reassigning students and rezoning—activities that ensure racial balance. Moreover, the district never implemented a majority-to-minority transfer program, a tool basic to "every" desegregation program, *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. Indeed, through its neighborhood assignment plan, the district affirmatively increased racial imbalances. Finally, "[i]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." *Spangler,* 427 U.S. at 439, 96 S.Ct. at 2706 (quoting *Howat v. Kansas,* 258 U.S. 181, 190, 42 S.Ct. 277, 281, 66 L.Ed. 550 (1922)). Although the school district could have sought modification or termination of the order at any time, it had no authority to decide unilaterally that it had achieved unitary status and had complied with the 1971 order in good faith. Because the district did not seek termination of the order through the proper judicial channels, prior to 1993 the district court never got the opportunity to contemporaneously review all of the other factors which indicate the achievement of unitary status. Given the district's failure to abide by its obligation to make *affirmative efforts* to desegregate through much of the 1980s and 1990s, and its disregard for the judicial decree, we believe the school district did not exhibit good faith for the last ten to fifteen years that it was subject to

the 1971 order.

In summary, the school district failed (1) to meet its burden of showing current imbalances are not vestiges of its prior unconstitutional practices, (2) to comply with the 1971 order throughout the 1980s and 1990s, and (3) to evince a good faith commitment to the court's order and the principles established in *Brown.* In light of these deficiencies, it is not clear whether the school board's actions after 1980 exacerbated, rather than alleviated, school segregation in Muscogee County at a time when the district was still subject to court order. Therefore, we hold that the district court erred in divesting itself of jurisdiction. Accordingly, the district court must retain jurisdiction in order to monitor the progress of the school district's desegregation efforts until such time as a reliable body of data exists to assure the district court that the school district has desegregated its schools to the maximum extent practicable. In particular, the district court should assess the school district's efforts in, and commitment to, combating imbalances by evaluating its new majority-to-minority transfer program, magnet school program, and any other programs that can be implemented in order to ensure long-term desegregation.[4] The school district also should begin compiling statistics comparing the quality of the education between

_____

[4]In both its order denying Plaintiffs' 1991 motion to enjoin the neighborhood assignment plan and its order vacating jurisdiction, the district court relied upon the school board's promises to implement an effective majority-to-minority transfer program and a magnet school program. However, this court does not have any information regarding the scope of those programs, and whether they are having any appreciable effect on school desegregation efforts.

those schools with a majority of white students and those schools with a majority of black students so that upon the district court's review of the school system's compliance with its desegregation decree, quality of education can be assessed along with student assignments. *See generally Freeman,* 503 U.S. at 492, 112 S.Ct. at 1446 (It is an appropriate exercise of discretion to address not only the elements of a unitary system discussed in *Green,* but to "inquire whether other elements ought to be identified, and to determine whether minority students were being disadvantage in ways that required the formulation of new and further remedies to insure full compliance with the court's decree.").

Because the parties and the district court agree that unitary status has been achieved with respect to faculty and staff assignments, facilities, transportation, and extracurricular activities, the district court's order divesting itself of jurisdiction over these matters is affirmed.

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and remanded for the district court to retain jurisdiction consistent with the principles discussed above.

AFFIRMED in part;  REVERSED in part;  and REMANDED.