[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
04/08/99
THOMAS  K. KAHN
CLERK

_____

No. 97-9199

_____

D. C. Docket No. 1: 69-CV-12972-RLV

UNITED STATES OF AMERICA, et al.,

Plaintiffs-Appellants,

versus

STATE OF GEORGIA, Meriwether County,
MERIWETHER COUNTY, et al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(April 8, 1999)**

Before ANDERSON and BARKETT, Circuit Judges, and HILL, Senior Circuit Judge.

ANDERSON, Circuit Judge:

I.    OVERVIEW

The United States and Charles Ridley et al. (collectively "Plaintiffs") appeal from the

district court's order of September 30, 1997 ("1997 Order"), ruling that continued federal court

supervision of the Troup County School District was inappropriate.  The district court based its

decision on its interpretation of a previous order in the case, entered many years earlier by the three-judge district court in United States v. Georgia, No. 12, 972 (N.D. Ga. July 23, 1973) ("1973 Order"). The 1973 Order involved the Troup County School District and numerous other school districts in the area. The 1997 Order construed the 1973 Order as having found that the Troup County School District had achieved "unitary status," and went on to conclude that federal court oversight of the district was therefore no longer proper. The district court accordingly vacated its prior order approving a 1995 consent decree entered into by the parties outlining a new desegregation plan and dismissed the case. Plaintiffs contend that the district court misinterpreted the 1973 Order by incorrectly reading it as having bestowed "unitary status" on the Troup County School District and therefore wrongly dismissed the case. For the reasons stated below, we agree. Accordingly, we reverse and remand.

## II.   FACTS AND PROCEDURAL HISTORY

This case began as a statewide suit filed by the United States on August 1, 1969, against the State of Georgia and eighty-one public school districts, including that of Troup County, to desegregate the schools in those districts. On December 17, 1969, the United States District Court for the Northern District of Georgia issued a detailed regulatory injunction, specifying the defendants' duties under Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686 (1954). In 1970, Charles Ridley and others joined the suit, intervening on behalf of black schoolchildren in the aforementioned districts.

The cases were then transferred to the federal judicial districts within which the defendant school districts were located. On June 7, 1973, the district court for the Northern District of Georgia ordered the parties to show cause why certain school districts, including Troup County, should not be dismissed from the suit. On July 11, 1973, the United States filed a response to the order, arguing that although the school districts had become unitary in the sense required by the then-existing Supreme Court precedent, the districts should not be dismissed from the case and should not be released entirely from court supervision. The United States suggested that the Troup County case be placed on the inactive docket, be placed under a less detailed permanent injunction (than the 1969 one), and recommended that the injunction automatically expire after seven years of substantial compliance. The United States' response attached a proposed order.

On July 23, 1973, a three-judge court for the Northern District of Georgia entered an order incorporating almost verbatim the proposed order suggested by the United States, with one relevant exception noted below. The 1973 Order noted that certain school districts, including Troup County, had become "unitary" in the sense required by Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686 (1954), Green v. New Kent County School Board, 391 U.S. 430, 88 S.Ct. 1689 (1968), and Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267 (1971). Following the United States' suggestion, the 1973 Order did not dismiss Troup County from the case. Rather, the court placed the case on the inactive docket, dissolved the detailed regulatory injunction set into place by the 1969 Order, and substituted a new permanent

3

injunction,[1] which followed almost verbatim the permanent injunction in the United States'

proposed order, with one exception. The proposed order had included a subparagraph (g)

providing that the new permanent injunction would automatically expire after seven years of

substantial compliance; however, the 1973 Order did not incorporate that paragraph; it excluded

entirely the automatic dismissal provision suggested by the United States. Rather, the 1973

Order placed the case on the inactive docket for an indefinite period of time, subject to

reactivation upon application of any party. No party appealed the 1973 Order.

In the ensuing years, issues arose as to whether Troup County was meeting its

desegregation obligations. Consequently, in May 1995, the parties reactivated the Troup County

case by submitting a consent decree positing a new desegregation plan. The district court, per

Judge Vining, approved and entered the consent decree on May 31, 1995, which imposed various

obligations on the Troup County School District. The consent decree also provided that if Troup

County would satisfactorily implement the decree's terms for a three-year period, the county

could then apply to the court, seeking a declaration of "unitary status" and a dismissal from the

case.

---

[1] The 1973 Order imposed upon Troup County certain general obligations prohibiting discriminatory actions (which might well have imposed upon Troup County nothing more than the same obligation that all school systems have to obey the Constitution and applicable laws), but in addition imposed the following obligations upon Troup County: (1) to maintain a majority-to-minority transfer plan incorporating free transportation and an obligation to make space available; (2) to ensure that all school construction, school consolidation and site selection (including location of any temporary classrooms) be done in a manner which will prevent the recurrence of the dual school structure; and (3) to permit transfers either outside the district or into the district only where the cumulative effect thereof will not reduce desegregation in either district.

4

In August 1996, James and Sandra Godfrey and others (collectively "Godfrey intervenors") moved to intervene, seeking to modify the 1995 consent decree and ultimately to vacate it. At a hearing before Judge Vining on June 23, 1997, the Godfrey intervenors argued that the 1973 Order had conferred a finding of unitary status on the Troup County School District, thereby indicating that retention of federal court jurisdiction or supervision was inappropriate. The court thereupon terminated the hearing and requested briefs on that threshold issue raised by the Godfrey intervenors.

After receiving the parties' briefs, the district court issued an order on September 30, 1997, construing the 1973 Order as a declaration of "unitary status." Holding that federal court jurisdiction and supervision thereafter was inappropriate, the court vacated its 1995 Order approving the consent decree. The Order also granted the Godfrey intervenors' motion to intervene for the limited purpose of allowing them to participate in this appeal. All other pending motions were dismissed as moot. Plaintiffs then filed timely notices of appeal.[2]

III. DISCUSSION

In this appeal, Plaintiffs and Troup County urge us to reverse the district court's order of September 30, 1997. They argue that the 1973 Order, though it mentioned the term "unitary," did not constitute a finding that Troup County had achieved "unitary status." They argue that the

_____

[2] The Godfrey intervenors' subsequent motion for summary affirmance of the district court's order was denied by this court. Their motion for expedited appeal, however, was granted. Plaintiffs' motion for summary reversal of the district court order is still pending before this court, and is now denied as moot in light of our disposition of this appeal.

1973 Order did not dismiss the case, but, quite the contrary, issued a permanent injunction and placed the case on an inactive docket subject to reactivation upon application by any party. Furthermore, they argue that all the parties to this case have for 24 years operated under the assumption that they were subject to federal court supervision, relying upon the obvious import of the 1973 Order and also relying upon numerous decisions in this and companion cases (which were also subject to the 1973 Order). Several of these decisions were previous opinions by the district court for the Northern District of Georgia, but one was rendered by the Eleventh Circuit itself, Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403 (11th Cir. 1985). On the other hand, the Godfrey intervenors argue on appeal that the court below correctly interpreted the 1973 Order.

We agree with Plaintiffs and Troup County. It is clear to us that the 1973 Order was not intended to be a finding that Troup County had achieved "unitary status."[3] It is clear that the 1973 Order did not dismiss the case or end federal court jurisdiction or supervision thereof; to the contrary, it imposed upon Troup County a permanent injunction and placed the case on its inactive docket, subject to reactivation upon application by any party. First, we discuss the case law which sets out the appropriate analysis for the determination as to whether a school district has achieved "unitary status." Then we set forth the reasoning which leads us to our interpretation of the 1973 Order.

A. The Relevant Case Law

---

[3] We assume arguendo that the district court's interpretation of the 1973 Order is a finding of fact subject to the clearly erroneous standard of review. We hold that the district court's assessment of the order was clearly erroneous.

The appropriate analysis for determining whether or not a school district that has practiced de jure segregation has achieved "unitary status" is well established by the case law in this circuit and the Supreme Court. Drawing upon Freeman v. Pitts, 503 U.S. 467, 112 S.Ct. 1430 (1992), and Board of Education of Oklahoma City v. Dowell, 498 U.S. 236, 111 S.Ct. 630 (1991), this circuit in Lockett v. Board of Education of Muscogee County, 111 F.3d 839 (11th Cir. 1997), set forth the following analysis:

> Utilizing sound discretion after such a careful factual assessment, a district court must determine (1) whether the local authorities have eliminated the vestiges of past discrimination to the extent practicable and (2) whether the local authorities have in good faith fully and satisfactorily complied with, and shown a commitment to, the desegregation plan. Lee v. Etowah County Bd. of Educ., 963 F.2d 1416, 1425 (11th Cir. 1992) (citing Dowell, 498 U.S. at 249-50, 111 S.Ct. at 638).
>
> In determining whether the local authorities have eliminated the vestiges of de jure segregation as far as practicable, a district court must examine six facets of school operation: student assignments, faculty assignments, staff assignments, transportation, extra-curricular activities, and facilities. ... In its discretion, a district court may consider other facets.

Id. at 842. Upon finding that a school system has achieved "unitary status," the district court must end its supervision of the school system and dismiss the case. Id. (citing Dowell, 498 U.S. at 248, 111 S.Ct. at 637, and Freeman, 503 U.S. at 489, 112 S.Ct. at 1445). Of course, a finding of "unitary status" and an order dismissing the case, thus ending federal court jurisdiction over and supervision of the school district, would be wholly inconsistent with the continuation of any federal court injunction. See Freeman, 503 U.S. at 491, 112 S.Ct. at 1445 ("A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation.").

7

B. Interpretation of the 1973 Order

We turn now to the reasons leading to our interpretation of the 1973 Order. The plain language and context of the 1973 Order, the historical context, and precedent all point ineluctably to the conclusion that the 1973 Order was not intended to be a finding of "unitary status" and an end to federal court jurisdiction over and supervision of the Troup County School District.

1. The Plain Language and Context of the 1973 Order

The 1973 Order did not dismiss the case, and did not end federal court jurisdiction over and supervision of the school district. Quite the contrary, although vacating the more detailed earlier injunction, the 1973 Order issued a new permanent injunction, imposing certain obligations on Troup County.[4] The fact that the 1973 Order imposed this permanent injunction upon Troup County is wholly inconsistent with an end to federal jurisdiction over and supervision of the school district. It follows logically that the 1973 Order could not have been intended as a finding of "unitary status."

---

[4] We reject the argument of the Godfrey intervenors that the permanent injunction was merely an "obey the law" injunction, imposing upon Troup County merely the same obligations that all school systems have under the Constitution and applicable laws. Contrary to their argument, the instant permanent injunction imposed upon Troup County obligations over and above those that would be owed by a school system which had never practiced de jure segregation or a school system which had achieved "unitary status." For example, the permanent injunction imposed upon Troup County an obligation to maintain a majority-to-minority transfer plan, and obligated Troup County to make space available for such transfers, and obligated Troup County to provide free transportation for such transfers. A school system which had never practiced de jure segregation, or which had achieved "unitary status," would not be subject to such obligations. Similarly, the permanent injunction imposed upon Troup County an obligation not to permit transfers either outside the district or into the district where the cumulative effect thereof would be to reduce desegregation in either district. Again, this is an obligation over and above what is per se required by the Constitution and applicable laws.

As the above discussion of the relevant case law reflects, a crucial finding required in any determination that a school system has achieved "unitary status" is a finding that the vestiges of past discrimination have been eliminated to the extent practicable. See e.g., Lockett, 111 F.3d at 842. However, the language of the 1973 Order is searched in vain for any mention at all of vestiges of discrimination. The matter simply was not addressed, and therefore the 1973 Order could not have been intended as a finding of "unitary status."

Similarly, instead of dismissing the case, as would be appropriate upon a finding of "unitary status" and an end of federal jurisdiction and supervision, the 1973 Order placed the case on an inactive docket subject to being reactivated by application of any party. Again, this feature of the 1973 Order is inconsistent with the interpretation urged by the Godfrey intervenors.

The context of the 1973 Order also supports our interpretation. The Show Cause Order that preceded the 1973 Order required the parties to show cause why the case should not be dismissed. In its response, the United States specifically opposed dismissing the case. Rather, the United States recommended dissolution of the previously entered detailed injunction and substitution of a new permanent injunction, the terms of which were set forth in an attached proposed order. The United States also represented in its response that it would monitor the school district's compliance by analyzing the reports to be filed by the school system and investigating any complaints.

The 1973 Order incorporated almost verbatim the proposed order suggested by the United States. The significance of this context is that, although the Show Cause Order had contemplated dismissing the case, the 1973 Order obviously acceded to the government's

9

recommendation that the case not be dismissed.  Instead, the Order imposed a new permanent injunction upon Troup County and placed the case upon the inactive docket subject to being reactivated upon application of any party.  The 1973 Order departed from the proposed order in only one way which has any relevance to this case.  The proposed order had provided for automatic dismissal of the case after seven years of substantial compliance with the new permanent injunction.   The 1973 Order did not incorporate that provision; rather, it left the new permanent injunction in place for an indefinite period of time.  Thus, the 1973 Order obviously left the matter of dismissing the case until a later time (e.g., upon reactivation of the case by any party).

2. The Historical Context

In addition to the plain language and the context of the 1973 Order, the historical context also supports our interpretation of the 1973 Order. The Godfrey intervenors rely upon the following language from the 1973 Order:

> [T]he Troup County School District ... [has] for three school years complied with the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483 (1954), and has become "unitary" in the sense required by the Supreme Court's decisions in Greene [citation omitted] and Swann [citation omitted].

We believe that this language, and its use of the term "unitary" must be understood in light of the meaning which courts in this circuit, in and around the 1973 time frame, were giving to the term "unitary."   The panel in Lee v. Etowah County Board of Education, 963 F.2d 1416, 1419 n.3 (11th Cir. 1992), citing and quoting from Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1413 n.12 (11th Cir. 1985), aptly described the meaning which courts in this circuit had previously attributed to the term "unitary," and distinguished that earlier meaning

10

from the meaning of "unitary status."[5]  To summarize, under the terminology prevalent at the

time of the 1973 Order, a school district was often found to be "unitary" merely because it had

not operated segregated schools as proscribed by Swann for a period of several years.  Although

labeled "unitary" during the 1973 time frame, the school districts involved may still have been

operating educational systems bearing the vestiges of discrimination and thus were still subject

to federal court supervision.  That is, they had not yet achieved "unitary status."  As described

above and as described in Lee v. Etowah County, "unitary status" requires a judicial

---

[5] It is useful to recite Note 3 from Lee in full:

Much confusion has arisen from the use of the terms "unitary"and "unitary
status."  In Georgia State Conference of Branches of NAACP v. Georgia, 775
F.2d 1403, 1413 n. 12 (11th Cir. 1985), this court defined a "unitary" school
system as one that "has not operated segregated schools as proscribed by cases
such as Swann [v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct.
1267, 28 L.E.2d 554 (1971)] . . . for a period of several years."  The court stated
that a school system that "has achieved unitary status is one which is not only
unitary but has eliminated the vestiges of its prior discrimination and has been
adjudicated as such through the proper judicial procedures."  Id.  This court later
rejected this labeling system and argued that the term "unitary" should be used
"only when referring to the status that a school board must achieve to be freed
from district court jurisdiction."  Pitts v. Freeman, 887 F.2d 1438, 1445 n. 7 (11th
Cir. 1989), rev'd on other grounds, 503 U.S. 465, 112 S.Ct. 1430, 118 L.Ed.2d
108 (1992).
    To minimize confusion, we discourage the future use of the term "unitary"
to describe a system that has not eliminated the vestiges of past discrimination to
the extent practicable but is merely currently in compliance with a court-imposed
desegregation plan; nevertheless, we assume for the purposes of this opinion that
the district court used the term "unitary" at this stage of this litigation to convey
just such a meaning.

Lee, 963 F.2d at 1419 n.3.

11

determination that a school district has implemented a desegregation plan in good faith and that the vestiges of discrimination have been eliminated to the extent practicable.[6]

Interpreting the 1973 Order in the context of its time, we believe that the 1973 Order's reference to the term "unitary" was not meant to embody a finding of "unitary status." Rather, the mention of the term "unitary" in the 1973 Order merely meant that Troup County no longer officially sanctioned a dual school structure.[7] Not constituting a finding of "unitary status," the 1973 Order did not end federal court supervision of the case.

This historical context undermines the primary argument of the Godfrey intervenors in this case. Based on the mere fact that the 1973 Order used the term "unitary," the Godfrey intervenors argue that the 1973 Order must have intended to accomplish all that later courts required to establish "unitary status." The historical context explains that the 1973 court meant something entirely different. The use of the term "unitary" in the 1973 time frame was entirely consistent with the court's failure, so far as the text of the 1973 Order itself or the record in this case indicates, to make any determination as to whether or not the vestiges of discrimination had

---

[6] The Supreme Court has also recognized the different meanings which courts have attached to the term "unitary." See Board of Ed. of Oklahoma City v. Dowell, 498 U.S. 237, 245, 111 S.Ct. 630, 635 (1991) (citing Georgia State Conf. and other cases, the Court recognized that "a school district could be called unitary and nevertheless still contain vestiges of past discrimination").

[7] This belief is reinforced by the similar situations involved in Steele v. Board of Public Instruction of Leon County, 448 F.2d 767 (5th Cir. 1971), and Youngblood v. Board of Public Instruction of Bay County, 448 F.2d 770 (5th Cir. 1971). In those two cases, the former Fifth Circuit vacated the orders of two district courts which had dismissed two desegregation cases after finding that the school systems were desegregated and "unitary" in nature. The plaintiffs in both cases argued that the cases should not be dismissed, but should instead be placed on the inactive docket for the next three school years at which time dismissal after notice and hearing could be considered. The former Fifth Circuit agreed and remanded the cases with instructions for the district court to reinstate the actions.

12

been eliminated to the extent practicable. The 1973 meaning of the term "unitary" is also consistent with the fact that the 1973 Order did not dismiss the case, but rather issued a permanent injunction and kept the case open on its inactive docket, subject to reactivation upon application of any party. While these things are consistent with the 1973 meaning of the term "unitary," they are of course flatly inconsistent with the achievement of "unitary status," which would require a determination that the vestiges of discrimination had been eliminated to the extent practicable and would call for dismissal of the case and withdrawal of federal jurisdiction and supervision.

3. Precedent

Finally, binding precedent supports our interpretation of the 1973 Order. The very 1973 Order at issue in this case was before this Court in Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403 (11th Cir. 1985). That case involved the Coweta County School District, not the Troup County School District, but the same order was before the Court, because the 1973 Order governed both the Coweta and Troup County School Districts. See United States v. Georgia, No. 12, 972 (N.D. Ga. July 23, 1973). Although this Court noted that the 1973 Order had referred to the Coweta County School District as "unitary," this Court held that the school district had yet to achieve "unitary status" and found that the case was not a concluded case. Georgia State Conference at 1413-14 & nn. 11-12. And although the parties to this case were not parties in the Georgia State Conference case, that panel's conclusion with respect to the posture of United States v. Georgia, No. 12, 972, is entitled to weight pursuant to the doctrine of stare decisis. There is no indication that the facts relevant to this Court's

13

discussion in Georgia State Conference were notably different than the operative facts in the instant record.

## IV. CONCLUSION

Based on the foregoing reasons, it is clear that the 1973 Order was not intended as a finding that Troup County had achieved "unitary status" as of that time.[8]  Our interpretation of the 1973 Order is clear from the plain language of the 1973 Order itself which is flatly inconsistent with having been intended as a finding of "unitary status."  Our interpretation is also supported by the historical meaning of the term "unitary" in the 1973 time frame, and by precedent.  Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

---

[8]  Nothing in this opinion should be read as commenting on whether the Troup County School District has indeed achieved "unitary status" since the 1973 Order.  Thus, Troup County is in no way prohibited from seeking a declaration of "unitary status" at the earliest possible juncture.  Our holding today confirms only that the 1973 Order does not constitute a finding of "unitary status" so as to make it inappropriate for the district court to have retained jurisdiction and supervision of this case over the intervening years.  Our holding today does not pretermit appropriate proceedings in the future, pursuant to Lockett v. Board of Education of Muscogee County, 111 F.3d 839 (11th Cir. 1997), which might culminate in a finding of "unitary status."

14